UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

LAURA HUTCHINSON, SONDRA
DANNERT, C. DONALD SMITH and
JOAN SMITH, husband and wife, AYDAN
KAYSERILI, ERICA McQUEEN,
KRISTINA SMITH, KEVIN VIRGIL,
PHILIP SANFORD, TRUDY McAVOY and
RANDY McAVOY, husband and wife,
GISELA SANCHEZ-MARTINEZ, and
CINDY KERR individually and on behalf of
others similarly situated,

**MEMORANDUM & ORDER**
08-cv-2781(NGG)

Plaintiffs,

-against-

BRITISH AIRWAYS PLC,

Defendant.
-------------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

In this putative class action, transferred here from the U.S. District Court for the Western District of Washington on July 11, 2008, twelve named Plaintiffs allege that Defendant British Airways Plc's ("BA") baggage handling system is operated "recklessly and with knowledge that damage would probably result." If Plaintiffs could so establish, the limitation on BA's liability for destroyed, lost, damaged, or delayed baggage set forth in Article 22(2) of the Montreal Convention[1] would not apply, and they could recover actual damages caused by the destruction, loss, damage or delay of their baggage.

---

[1] Convention for the Unification of Certain Rules for International Carriage by Air, May 28, 1999 (entered into force on Nov. 4, 2003), reprinted in S. Treaty Doc. No. 106-45, 1999 WL 33292734.

1

Now before the court is BA's Motion to Dismiss (Docket Entry # 17) Plaintiffs' Second Amended Class Action Complaint (Docket Entry # 31) for failure to state a claim on which relief can be granted. For the reasons that follow, BA's Motion is DENIED.

I.     THE COMPLAINT

Plaintiffs' Second Amended Class Action Complaint (the "Complaint," or "2AC") alleges that BA's baggage handling system as a whole is inadequate. It alleges that the Air Transport Users Council determined that BA loses (temporarily or permanently) 23 bags per 1,000 passengers carried, which is a rate 60% higher than the industry average. (2AC ¶ 4.) This translates to over 1 million lost bags over the two years prior to Plaintiffs' filing suit. (Id.) The Association of European Airlines ("AEA") noted that in April, May, and June of 2007, BA lost one piece of baggage for every 36 passengers it carried, a rate significantly worse than any other airline, and twice the rate of the worst United Sates airline. (Id. ¶ 36.) The Complaint alleges that BA requested that AEA not disseminate this information. (Id.)

According to the Complaint, BA's "processing centre" at Heathrow Airport has been overrun with lost baggage, including "a massive backlog of thousands of pieces of lost luggage[.]" (Id.) In March 2007, employees of BA admitted that BA had a backlog of 40,000 lost bags that had yet to be returned to their owners, and in April 2007, admitted that its baggage handling system was running at nearly 25% above capacity. (Id. ¶ 6.) BA later attempted to hire 340 additional baggage handlers and scores of customer service operators to remedy its shortcomings. (Id. ¶ 35.) An undercover investigation conducted by the "Sunday Telegraph" revealed the "habitual indifference" of BA to its passengers' baggage, noting that BA commonly allowed baggage to fall off of carts, and Plaintiffs allege that BA misroutes baggage and leaves it outside in pouring rain. (Id. ¶¶ 38, 33.)

Moreover, Plaintiffs allege that BA failed to notify its passengers of the elevated risk of mismanaged baggage and that BA prematurely auctioned off some of the lost baggage, sometimes after being lost for only a few weeks. (Id. ¶ 7.) BA has also failed to provide accurate information to its passengers regarding the status of lost and delayed baggage. (Id. ¶¶ 8-9, 36.) At the same time, Plaintiffs allege that BA has been aware of the severity of the shortcomings in its baggage handling system. For example, BA's representatives have stated that BA is "trying to make improvements to our baggage performance" and that "our service to our customers may not always reflect the usual levels of customer service we pride ourselves on." (Id. ¶ 5.) BA's Director of Operations stated in 2007 that "we accept that overall levels of service we offered to our customers has not been up to an acceptable standard." (Id.)

The Complaint includes specific allegations relating to the experiences of the named Plaintiffs. Plaintiffs allege that their baggage was destroyed, lost, damaged, or delayed and that they were given inaccurate information regarding the status of their baggage. (See, e.g., id. ¶¶ 39-41 (Laura Hutchinson was told twice that that her bags would be delivered to her dormitory, but she never received them); ¶¶ 47-48 (Joan Smith, whose baggage was lost, found her baggage, water-damaged beyond repair, in the lost baggage area in the Naples airport); ¶¶ 51-52 (Aydan Kayserili was repeatedly and inaccurately told bags would be arriving, and so waited to purchase replacement clothing); ¶ 63 (Kristina Smith's baggage, heavily water-damaged, was found only after she returned from a trip).) Certain Plaintiffs were forced to make multiple phone calls to BA and fruitless trips back to the airport to try to collect baggage which was not there, and they suffered great inconvenience without their baggage. (See, e.g., id. ¶¶ 40-41 (Laura Hutchinson spent hours on hold with BA's customer service line; one month after her bags were lost, she was told to come to Charles de Gaulle airport to talk with someone, only to be told that BA could not

3

help her); id. ¶¶ 44-45 (Joan Smith, who travelled to Italy for a romantic vacation with her husband, was deprived of nearly all of her travel items when her baggage was lost, and had to spend vacation time shopping; her husband spent hours on the phone with BA attempting to locate their baggage); id. ¶¶ 64-67 (Philip Sanford checked his bicycle for a cycling vacation in Europe, but his bicycle never arrived; his cycling trips were ruined); id. ¶ 72 (at BA's direction, Cindy Kerr made four fruitless trips back to the Nairobi airport to retrieve her delayed baggage).)

Plaintiffs allege that BA acted "recklessly and with foreseeable knowledge that damage, delay, and loss of passenger baggage would continue unabated as a result of its inadequate, careless system of baggage transport." (Id. ¶ 81.) They seek relief on behalf of members of the following class:

> All United States citizens and permanent residents who, between September 5, 2005 and September 5, 2007, traveled internationally on a British Airways flight from one State Party to another State Party (as defined by the Montreal Convention), and whose checked baggage was lost, damaged, or delayed.

(Id. ¶ 82.)

## II. DISCUSSION

### A. Standard of Review

In considering a motion under Rule 12(b)(6) for failure to state a claim, the court "accept[s] all factual allegations in the complaint as true and draw[s] all reasonable inferences in the plaintiffs' favor." Bellikoff v. Eaton Vance Corp., 481 F.3d 110, 115-16 (2d Cir. 2007) "In order to state a claim upon which relief can be granted, a complaint need only plead 'enough facts to state a claim for relief that is plausible on its face.'" Sharkey v. Quarantillo, 541 F.3d 75, 92 (2d Cir. 2008) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1974 (2007)). "That said, a plaintiff's pleading obligation still 'requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'" Burch

v. Pioneer Credit Recovery, Inc., 551 F.3d 122, 124 (2d Cir. 2008) (quoting Twombly, 127 S. Ct. at 1965).

The Supreme Court's decision in Twombly sets out a "flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible,'" but does not "mandate a 'universal standard of heightened fact pleading.'" Petrucelli v. Hasty, — F. Supp. 2d —, 2009 WL 766200, at *3 (E.D.N.Y. Mar. 25, 2009) (quoting Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir.2007) (emphasis in original)). "On a motion to dismiss, the issue is whether the claimant is entitled to offer evidence to support the claims." Patane v. Clark, 508 F.3d 106, 111 (2d Cir. 2007) (internal quotation marks omitted).

### B. The Montreal Convention

The Montreal Convention is a comprehensive international treaty of private international air law that, among other things, addresses the liability of airline carriers for destroyed, lost, damaged or delayed baggage. See Montreal Convention, art. 17(2) (addressing "damage sustained in case of destruction or loss of, or of damage to, checked baggage") & 19 (addressing "damage occasioned by delay in the carriage by air of . . . baggage"). As of 2003, it replaced the earlier "Warsaw Convention,"[2] which was drafted in the 1920's "when the airline industry was in its infancy." See Ehrlich v. Am. Airlines, Inc., 360 F.3d 366, 370, 371 n.4 (2d Cir. 2004) (quoting In re Air Disaster at Lockerbie, Scotland on December 21, 1988, 928 F.2d 1267, 1270 (2d Cir. 1991)). While the primary aim of the Warsaw Convention was to "limit the liability of air carriers in order to foster the growth of the commercial aviation industry," id. at 371 n.4 (quoting Sulewski v. Federal Express Corp., 933 F.2d 180, 184 (2d Cir. 1991) (internal quotation

---

[2] Convention for Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, T.S. No. 876 (1934).

5

marks and ellipses omitted)), the Montreal Convention stresses the "'the importance of ensuring protection of the interests of consumers in international carriage by air and the need for equitable compensation based on the principle of restitution,'" id. (quoting Montreal Convention, preamble).

Relevant here is Article 22 of the Montreal Convention. Article 22(2) expressly limits the liability of carriers for the destruction, loss, damage or delay of baggage.[3] Article 22(5) removes this limitation, however, if a plaintiff can "prove[] that the damage resulted from an act or omission of the carrier, its servants or agents, done with intent to cause damage or recklessly and with knowledge that damage would probably result[.]" On BA's Motion to Dismiss, Article 22(5)'s exemption from the liability limitation is at issue—specifically the language: "recklessly and with knowledge that damage would probably result."

Few cases have addressed this language from the Montreal Convention. See Booker v. BWIA West Indies Airways Ltd., No. 06-cv-2146(RER), 2007 WL 1351927, at *5 (E.D.N.Y. May 8, 2007). ("The Court is not aware of any case law analyzing Article 22(5) of the Montreal Convention[.]"). Nevertheless, "courts have previously relied on cases interpreting a provision of the Warsaw Convention where the equivalent provision in the Montreal Convention was substantively the same." Id. (emphasis added). There is ample authority addressing Article 25 of the Warsaw Convention,[4] the provision equivalent to Article 22(5) of the Montreal Convention, and the Fourth, Fifth, and Eleventh Circuits have observed that Article 22(5)

---
[3] Article 22(2) limits liability to 1,000 Special Drawing Rights ("SDR") per passenger, unless the passenger has made a "special declaration of interest in delivery at destination and has paid a supplementary sum if the case so requires." Pursuant to Article 23, an SDR is a sum defined by the International Monetary Fund, and its value "is established by a 'basket' of currencies (the U.S. dollar, the Japanese yen, and the British pound)." See Bassam v. American Airlines, 287 Fed. Appx. 309, 311 n.2 (5th Cir. 2008).

[4] See Brink's Ltd. v. South African Airways, 93 F.3d 1022, 1027-28 (2d Cir. 1996) ("The carrier shall not be entitled to avail himself of the provisions of this convention which exclude or limit his liability, if the damage is caused by his [willful] misconduct or by such default on his part as, in accordance with the law of the court to which the case is submitted, is considered to be equivalent to willful misconduct." (quoting Warsaw Convention, Article 25) (emphasis omitted)).

"clarifies the definition of willful misconduct under Article 25, rather than effecting a substantive change in the law." Cortes v. American Airlines, Inc., 177 F.3d 1272, 1290 (11th Cir. 1999); see also Bayer Corp. v. British Airways, LLC, 210 F.3d 236, 238 n.* (4th Cir. 2000); Bassam, 287 Fed. Appx. at 315.[5] Moreover, the Second Circuit has long interpreted the Warsaw Convention's "willful misconduct" language in a way that reflects the standard embodied in Article 22(5) of the Montreal Convention. See Republic Nat'l Bank of New York v. Eastern Airlines, Inc., 815 F.2d 232, 238-39 (2d Cir. 1987) ("Willful misconduct requires either 'the intentional performance of an act with knowledge that the performance of that act will probably result in injury' or 'the intentional performance of an act in such a manner as to imply reckless disregard of the probable consequences.'" (quoting Pekelis v. Transcontinental & Western Air, 187 F.2d 122, 124 (2d Cir. 1951)). Accordingly, the court looks to the language of Article 22(5) and the long line of cases interpreting Article 25 of the Warsaw Convention.

### C. BA's Motion to Dismiss

BA moves to dismiss principally on the grounds that Plaintiffs have failed to adequately allege that its conduct was "reckless," or that it acted "with knowledge that damage would probably result." (Def. Br. (Docket Entry # 17) 9-14.) As an initial matter, both BA and Plaintiffs agree that, in order for BA to be held responsible without limitation for Plaintiffs' injuries, Plaintiffs must prove that BA was subjectively aware that its conduct would probably cause destruction, loss, damage, or delay. (Pl. Opp. (Docket Entry # 23) 14; Def. Br. 13.) As mentioned above, a defendant's awareness of the probable results of its actions (or inactions) has long been a feature of Second Circuit Warsaw Convention cases. See, e.g., Republic Nat'l Bank,

---

[5] Two of these cases deal with to the earlier "Montreal Protocol," an amendment to the Warsaw Convention from which the Montreal Convention adopted the language of Article 22(5). See Bassam, 287 Fed. Appx. at 315.

7

815 F.2d at 238-39. The plain language of Article 22(5), which requires "knowledge that damage would probably result," also supports such a requirement.

Plaintiffs specifically allege that BA was subjectively aware that its baggage handling system would, in fact, cause damage loss or delay to some of its passengers' baggage. To support its allegation of recklessness, the Complaint alleges, among other things, that BA stated to customers that it was "trying to make improvements to our baggage performance," and that its service to its passengers had "not been up to an acceptable standard." (2AC ¶ 5.) BA also admitted that it had at least a 20,000 bag backlog of mishandled passenger baggage. (Id. ¶ 6.) Moreover, in its Motion to Dismiss, BA concedes that the Complaint sets out a 2.8% lost baggage rate for portions of the challenged period, and a 2.3% rate for another period. (Def. Br. 14, 16-17.)

In support of dismissal, however, BA argues that the use of the term "probably" in Article 22(5) means that the court must consider whether it is more likely than not that <u>any particular bag</u> would be lost, damaged or delayed. (Def. Br. 13-14.) BA's position is that, in order for it to have been aware "that damage would probably result," it must have known that <u>each bag</u> was more likely than not to be mishandled—<u>i.e.</u>, its mishandling rate had to be worse than fifty percent. Because the Complaint alleges a baggage loss rate no greater than 2.8%, BA argues that it could not have been aware that "damage would probably result," and the limitation exemption in Article 22(5) cannot apply. (Id. at 14.)

BA's extreme position misconstrues the nature of Plaintiffs' challenge.[6] Plaintiffs are not alleging that BA's baggage handling system was operated recklessly simply because BA lost

---

[6] And, in any event, a conflicting position is also suggested by focusing exclusively on the word "probably" and the rate of loss, as BA urges. Since it is not disputed that BA's system results in the loss of 2.8% of bags, it is not just <u>probable</u> that damage will result from BA's baggage handling system, it is <u>certain</u>. Accordingly, were the court to focus solely on the rate of loss, it could conclude that Plaintiffs are challenging a policy that BA implemented with

8

some bags. Instead, Plaintiffs have alleged that, although BA's rate of damage appears to be low, its conduct places it sixty percent above the industry average for misplaced baggage. They allege that BA knowingly operated its baggage handling system at 25% above its operating capacity, and that BA was aware of the increased likelihood of damage to the bags of its passengers on account of its reckless conduct. Moreover, Plaintiffs have alleged that BA would auction off baggage only weeks after the baggage was lost, have pointed to conduct resulting in damage to bags, and have alleged that BA concealed its harmful practices from its passengers. Plaintiffs have supplemented these allegations with particular actions relating to each individual Plaintiff that make more plausible their claim that the system was operated recklessly. Therefore, rather than focusing on whether an individual bag would more likely than not be damaged, the court considers whether the system as a whole was operated recklessly, in light of the allegations in the Complaint.[7]

In support of its argument that Plaintiffs have failed to sufficiently allege recklessness, BA points to several Warsaw Convention cases.[8] (See Def. Br. 9-13 (citing Saba v. Compagnie

---

knowledge that damage would certainly result. But, of course, it cannot be the case that the liability cap is lifted merely because an airline knows that some bags will be lost, since all airlines must operate their baggage systems with the knowledge that some bags are lost. The fact that such an untenable result follows from the kind of myopic interpretation urged by BA only supports a decision not to focus exclusively on the probability of loss, which, on its own, cannot determine whether an airline operated its baggage handling system recklessly.

[7] Although courts have typically viewed Warsaw Convention cases in the context of more specific or concrete conduct of an airline or its employees, neither party takes the position that a challenge to BA's overall baggage handling system is inappropriate for consideration under the Montreal Convention. In this regard, the court notes that it may consider a pattern of conduct in determining recklessness, see Saba, 78 F.3d at 667 ("a court may, when determining whether a defendant acted in reckless disregard of consequences, consider a pattern of conduct even if no one action or omission by itself would meet that standard"), but that "[i]ndividual acts of negligence on the part of employees—without more—cannot . . . be combined to create a wrongful corporate intent." Id. at 670 n.6.

[8] BA also argues that it can only be held liable if it is proved that it knew it would cause damage rising to the level of personal injury or death. (Def. Br. 14-16.) This argument is unsupported by the text of the Montreal Convention. The Montreal Convention plainly uses the word "damage" to refer to all kinds of damage, including in Article 19, "damage occasioned by delay in the carriage by air of . . . baggage" and, in Article 17, "damage sustained in case of destruction or loss of, or of damage to, checked baggage." Moreover, the limitation on liability in Article 22 expressly refers to damage in the "carriage of baggage," and the Convention includes a completely separate limitation on liability, in Article 21, for damages "sustained in case of death or bodily injury of a passenger." Unlike in the case of damage occasioned by baggage handling, Article 21 of the Convention holds a carrier fully

Nationale Air France, 78 F.3d 664 (D.C. Cir. 1996); Dazo v. Globe Airport Security Servs., 295 F.3d 934 (9th Cir. 2002); Chukwuma v. Groupe Air France, Inc., 767 F. Supp. 43 (S.D.N.Y. 1991); Nipponkoa Ins. Co. v. GlobeGround Servs., Inc., No. 04 C 5648, 2007 WL 2410292 (N.D. Ill. Aug. 17, 2007); Locks v. British Airways, 759 F. Supp. 1137 (E.D. Pa. 1991); Republic Nat'l Bank, 815 F.2d 232).) Of these cases, only Dazo addressed the sufficiency of allegations in a complaint on a motion to dismiss for failure to state a claim, and the rest had the benefit of factual submissions. Nonetheless, the court briefly reviews these cases, because they provide guidance in assessing the sort of showing that a plaintiff must make to prove recklessness. The cases deal principally with failures of the plaintiffs' offered evidence, and lead the court to the conclusion that meeting the standard of liability under Article 22(5) is extremely difficult.

In Dazo, the plaintiff's carry-on bag was stolen between the time she placed it on the airport's x-ray machine conveyor belt and when she passed through the metal detector to retrieve it. 295 F.3d at 937. In asserting a claim under the Warsaw Convention, the plaintiff alleged that defendants "knew that similar thefts had occurred at the airport but failed to make reasonable efforts to prevent such thefts, thereby subjecting her to an unreasonable degree of risk." Id. at 940. The district court concluded that the allegations in the plaintiff's complaint were insufficient to meet the Warsaw Convention's willful misconduct standard. Id. at 937.[9] On appeal, the Ninth Circuit affirmed, concluding that the plaintiff had failed to allege the defendants "had a positive intent to harm her, or that they had a positive, active and absolute

---

responsible for damage "sustained in case of death or bodily injury of a passenger" except if it proves that "(a) such damage was not due to the negligence or other wrongful act or omission of the carrier or its servants or agents; or (b) such damage was solely due to the negligence or other wrongful act or omission of a third party." The text of the Convention therefore demonstrates that damage caused by delayed or lost baggage is fully recoverable if the requisite showing of knowing recklessness is made.

[9] The court gave plaintiff leave to amend, but the plaintiff declined to do so. Id.

10

disregard, or even reckless disregard, for the consequences of any lapses in security." Id. at 941. The court agreed with the district court's characterization of the plaintiff's allegations as "essentially that [defendant] failed to completely prevent thefts at the security checkpoint. Absent concrete allegations of intentional performance of acts committed with the knowledge that the theft of baggage would occur[,] a stolen bag is simply not tantamount to [willful] misconduct." Id. at 940 (internal quotation marks and alterations omitted).

In Saba, the defendant airline had inadequately packaged the plaintiff's carpets in violation of its own internal regulations; moreover, in spite of publicly forecasted showers, its agent left the carpets outside in the rain overnight. See 78 F.3d at 666. The D.C. Circuit reversed the district court's finding of "willful misconduct," concluding that there had been "no showing" that defendant, its agents or employees were "subjectively aware of serious risks attending packaging the carpets inadequately in violation of regulations or leaving the carpets outside." Id. at 670. Nor was there evidence that defendant's agents or employees expected rain, or knew that, if it did rain the packaging would fail to withstand a downpour. Id. "Without any such evidence," the court concluded, "the inference that [defendants] . . . intended (or recklessly disregarded the high risk of) bad consequences is entirely unwarranted. . . ." Id.

In Chukwuma, the plaintiff checked baggage at John F. Kennedy International Airport ("JFK") for his trip to Lagos, Nigeria, but two of these bags were delayed in transit. 767 F. Supp. at 44. After about a week, one of the bags turned up damaged and pilfered. Id. In rejecting plaintiff's argument that the defendant's mishandling of his baggage was "willful misconduct," the court explained that "[d]espite his submission to the Court of numerous affidavits and exhibits in connection with this action," the court held, the "plaintiff has done no more than rely on conclusory allegations, and mere speculation and conjecture." Id. at 48

11

(internal citations and quotation marks omitted). The plaintiff could not proceed to trial "solely on the basis of the fact that some of his luggage was lost or stolen[.]" Id.

In Nipponkoa, laptop computers were flown from the Philippines to Chicago's O'Hare International Airport and were taken by defendants from the airport to a warehouse. 2007 WL 2410292, at *2. The defendant's employees subsequently released the laptop computers to an individual who had presented handwritten paperwork "purporting to authorize him to take delivery of the laptops." Id. "Later in the day, the proper consignee appeared to pick up the laptops. It was eventually determined that the laptops had been stolen by the person who had picked them up at the warehouse." Id. In a suit involving claims of willful misconduct under the Warsaw Convention, the court found that the requisite showing had not been made. Id. at *6-*7.

Noting that the burden rested with the plaintiff to show willful misconduct, the court in Nipponkoa outlined the deficiencies in plaintiff's evidence. Among other things, plaintiff relied on the fact that the defendant did not follow its own procedures for high value cargo, and should have known to do so. Id. at *7. The court was not persuaded, explaining that the laptops were never designated as high value cargo, and there was no evidence to support an inference that defendant's failure to treat them as such was more than negligent. Id. The plaintiffs also pointed to evidence that the person who picked up the cargo used a handwritten release and was acting suspiciously at the warehouse. Id. The court stated that the defendant's procedures allowed handwritten releases, and that the pickup man's conduct was not "so suspicious that it can be inferred that the [defendant's] employee knew the goods were likely to be stolen." Id. The court reasoned that the "mere failure to follow applicable or appropriate procedures is negligence," and that "[r]ecklessness requires subjective awareness that one is doing something wrong. The potential risks must be serious and likely to occur." Id. at *6. It held that "Plaintiff has not

presented sufficient evidence to support that the loss of the goods was the result of anything beyond negligence." Id. at *7.

In Locks, the plaintiff checked a crate containing a $20,000 metal sculpture. 759 F. Supp. at 1138.[10] When the sculpture arrived in Philadelphia, an employee of the defendant airline "presented the crate to customs officials for inspection." Id. Noticing that the metal sculpture seemed unusually heavy—and because it could not fit in the x-ray machine—the customs official drilled several small holes in the bottom of the sculpture (presumably to see what was inside (which was sand)). Id. The plaintiff claimed damages under the Warsaw Convention, asserting a theory of willful misconduct. Id. at 1138-39.

The plaintiff pointed to the airline employee's ignorance of a federal regulation prohibiting customs officials from opening containers, and requiring that they detain the container until the owner (or his agent, etc.) opens or refuses to open it. Id. at 1140-41. The plaintiff also pointed to the airline's failure to supervise its baggage employees. Id. at 1141. In granting summary judgment to the defendant, the court concluded that the "plaintiff has failed to satisfy the burden he shoulders in seeking to avoid the Warsaw Convention's damage cap." Id. The regulations identified by the plaintiff governed the conduct of customs officials, not airline employees, and the plaintiff had produced "no facts that would suggest that [defendant] possessed the kind of awareness of a likelihood of probable harm that is necessary to sustain a finding of willful misconduct." Id.

Finally, in Republic National Bank, the plaintiff, a bank, "operated an in-house courier service for the transportation of currency as checked baggage aboard international passenger flights." 815 F.2d at 234. Before a flight from JFK to Lima, Peru and then to Santiago, Chile,

---

[10] The sculpture was "three metal pails that have been welded together in the shape of a cloverleaf and whose tops are sealed." Id.

the plaintiff's courier turned over to the defendant airline two bags: one containing $2 million, the other containing $4.5 million. Id. at 234-35. These bags were loaded on the plane with the other baggage, and the courier was permitted special access to the plane's cargo bin to visually inspect the bags during a stopover in Miami. Id. at 235. Perhaps not surprisingly, the $2 million dollar bag went missing, and so the plaintiff sued the airline.

Addressing the issue of willful misconduct under the Warsaw Convention, the Second Circuit observed that the plaintiff must "satisfy its burden by proving that [defendant airline] acted in reckless disregard of the probable consequences of its acts in loading [the plaintiff's] baggage in New York." Id. at 239. The plaintiffs offered several reasons that the airline's actions amounted to willful misconduct, including the fact that it had violated its own rules prohibiting the acceptance of currency as checked baggage. Id.[11] The Second Circuit rejected defendant's position, concluding that the plaintiff had "failed to produce any evidence from which a reasonable jury could find that willful misconduct of [defendant's] personnel caused [plaintiff's] loss." Id. at 240. It explained that the mere acceptance of baggage containing currency, even in violation of airline rules, does not "alone create a probability of its loss." Id. at 239. Plaintiffs had "failed to produce any evidence that the mere acceptance of its currency bags as checked baggage was likely to result in loss and that Eastern was aware of this likelihood." Id.

The court takes several points of guidance from these cases. First, to qualify for Article 22(5)'s exemption from the liability limitation, Plaintiffs must produce evidence that BA's conduct was more than merely negligent, and that BA was subjectively aware of an unjustifiable

---

[11] Plaintiff also argued that defendant had failed to adopt formal security procedures for high value baggage, and failed to follow its own de facto procedures requiring the placement of plaintiff's baggage in the front of the cargo bin. Id. Rejecting these arguments, the Second Circuit pointed out that plaintiff itself had chosen not to follow the airline's formal procedures, and had been the one to suggest where the baggage should be placed in the cargo bin. Id. at 239-40.

14

likelihood that its conduct would result in damage. See id. at 238-39; Saba, 78 F.3d at 670; Locks, 759 F. Supp. at 1141; Nipponkoa, 2007 WL 2410292, at *6-*7. Moreover, Plaintiffs will have to show not only an extreme departure from the standard of ordinary care, but also that BA was subjectively aware of such a departure. See Saba, 78 F.3d at 669, 670, 673 n.4 (recklessness requires "extreme departure from standard of ordinary care," as well as proof that defendant "was cognitively aware of the danger and therefore had the requisite subjective intent"). In making this showing, Plaintiffs will not be able to rely solely on the fact of loss, damage or delay, see Chukwuma, 767 F. Supp. at 48, or the mere knowledge of possible loss, damage or delay, see Dazo, 295 F.3d at 940-41. Nor can Plaintiffs rely solely on BA's failure to observe customary or preferred procedures. See Republic Nat'l Bank, 815 F.2d at 239; Saba, 78 F.3d at 670, Nipponkoa, 2007 WL 2410292, at *6.

With these principles in mind, the court is not persuaded by BA's argument that Plaintiffs have failed to state a claim. The Plaintiffs' Complaint asserts that BA's conduct was an extreme deviation from the norms of behavior in the airline industry, that BA was aware of this extreme deviation—as well as the likelihood that its conduct would result in a substantial increase in the risk of damage to its passengers' bags—but that BA consciously ignored the risk in continuing its baggage handling policies. BA's baggage handling system was operated well above its capacity to adequately handle baggage, and resulted in bags lost at a rate significantly worse than other airlines. Moreover, Plaintiffs allege that BA prematurely auctioned off unclaimed baggage and hid the deficiencies in its baggage handling system from its customers. Statements of BA personnel indicate an awareness of a heightened degree of risk of damage to its passengers' bags. On a motion to dismiss, these allegations plausibly suggest recklessness on the part of BA.

15

Furthermore, the cases outlined above suggest that the crucial issues of subjective awareness of harm and the degree of risk to Plaintiffs' baggage should be considered with the benefit of evidence. While it might be true that BA's overall baggage handling rate was very good, the court cannot consider this rate separately from the context of industry norms regarding baggage handling: whether BA's implementation of its baggage handling system amounted to an extreme departure from standards of care in the airline industry, whether BA was conscious of the severity of any such departure, and whether BA knowingly proceeded in spite of this departure, are issues that are better addressed with the benefit of evidence. At this point, the court cannot determine whether or how Plaintiffs will satisfy their high evidentiary burden to show knowing recklessness, nor can it determine whether BA's actions were nothing more than negligent, or not culpable at all. But, as a matter of pleading, the court concludes that the allegations in the Complaint plausibly suggest a claim for actual damages under Article 22(5).

## III. CONCLUSION

It is certainly true, as BA contends, that "an airline may legitimately fail to deliver a checked bag to the passenger at his or her destination due to issues such as aircraft performance and loading limitations, air traffic control requirements, the need to avoid inconveniencing hundreds or thousands of other passengers, overloaded airport facilities caused by increased passenger traffic or inadequate public investment security requirements or concerns, and no doubt many other reasons." (Def. Br. 16.) Indeed, it may be that the injuries complained of in this case are the result of ordinary or gross negligence, and thus, are ineligible for Article 22(5)'s expanded recovery. On the other hand, the Complaint plausibly suggests that the stated injuries were the result of recklessness on the part of BA, and that BA was subjectively aware of an unjustifiable risk of injury to its passengers' baggage. At this stage of the litigation—prior to

Furthermore, the cases outlined above suggest that the crucial issues of subjective awareness of harm and the degree of risk to Plaintiffs' baggage should be considered with the benefit of evidence. While it might be true that BA's overall baggage handling rate was very good, the court cannot consider this rate separately from the context of industry norms regarding baggage handling: whether BA's implementation of its baggage handling system amounted to an extreme departure from standards of care in the airline industry, whether BA was conscious of the severity of any such departure, and whether BA knowingly proceeded in spite of this departure, are issues that are better addressed with the benefit of evidence. At this point, the court cannot determine whether or how Plaintiffs will satisfy their high evidentiary burden to show knowing recklessness, nor can it determine whether BA's actions were nothing more than negligent, or not culpable at all. But, as a matter of pleading, the court concludes that the allegations in the Complaint plausibly suggest a claim for actual damages under Article 22(5).

## III. CONCLUSION

It is certainly true, as BA contends, that "an airline may legitimately fail to deliver a checked bag to the passenger at his or her destination due to issues such as aircraft performance and loading limitations, air traffic control requirements, the need to avoid inconveniencing hundreds or thousands of other passengers, overloaded airport facilities caused by increased passenger traffic or inadequate public investment security requirements or concerns, and no doubt many other reasons." (Def. Br. 16.) Indeed, it may be that the injuries complained of in this case are the result of ordinary or gross negligence, and thus, are ineligible for Article 22(5)'s expanded recovery. On the other hand, the Complaint plausibly suggests that the stated injuries were the result of recklessness on the part of BA, and that BA was subjectively aware of an unjustifiable risk of injury to its passengers' baggage. At this stage of the litigation—prior to

any discovery relating to Plaintiffs' claims—the court cannot say that application of Article 22(5) must be ruled out. Plaintiffs are entitled to offer evidence in support of their claim. Accordingly, the court denies BA's Motion to Dismiss.

SO ORDERED.

Dated: Brooklyn, New York
April 6, 2009

/s/ Nicholas G. Garaufis
NICHOLAS G. GARAUFIS
United States District Judge